

AMENDED JANUARY 14, 2010.

2010 JAN 19 P 2 38

CLERK
U.S. BANKRUPTCY
DISTRICT OF ARIZONA

1

2 **ANDREW C. BAILEY**
2500 N. Page Springs Rd
3 Cornville, AZ 86325
928 634-4335
4 *Self-Represented Litigant*

5

6 ## IN THE UNITED STATES BANKRUPTCY COURT

7 ## FOR THE DISTRICT OF ARIZONA

8

| | |
|---|---|
| **ANDREW C. BAILEY**<br>Plaintiff<br>vs<br><br>WELLS FARGO BANK NA a/k/a WELLS FARGO HOME MORTGAGE ET AL (WELLS FARGO)<br><br>FIRST AMERICAN LOANSTAR TRUSTEE SERVICES LLC<br><br>FIRST AMERICAN TITLE INSURANCE COMPANY<br><br>FIDELITY NATIONAL TITLE INS CO<br><br>US BANK NA AS TRUSTEE FOR WFMBS 2006-AR2 (US BANK)<br><br>WFMBS 2006-AR2<br><br>LEHMAN BROTHERS INC<br><br>JOHN DOES "3001-4000"<br>Defendants | **Chapter 11**<br>**BK Case #: 2:09-bk-06979-PHX-RTBP**<br>**AP Case # 2:09-ap-01727-RTBP**<br><br><br>**AMENDED COMPLAINT FOR ENFORCEMENT OF QUALIFIED WRITTEN REQUEST AND TEMPORARY RESTRAINING ORDER**<br><br><br><br>Related to<br>Subject property:<br>153 Western Avenue,<br>Glendale, CA 91201.<br>Wells Fargo Account #: 0060412178 |

22 Plaintiff sues Defendants to compel discovery pursuant to F.R.B.P 7001(2) and 7001(9),
23 to answer the Qualified Written Request pursuant to the Real Estate Settlement
Procedures Act 12 U.S.C. § 2605 and Debt Validation Letter pursuant to the Fair Debt
24 Collection Practices Act 15 U.S.C §1692, and to stay any foreclosure or other action
before and until the resolution of this complaint, and states:
25

- 1 -

## I. Jurisdiction, Venue and Statutory Predicate

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicate for the relief requested herein is Federal Rule of Bankruptcy Procedure 7001(2) to determine the validity, priority, or extent of a lien or other interest in property, other than a proceeding under Rule 4003(d), and Federal Rule of Bankruptcy Procedure 7001(9) to obtain a declaratory judgment relating to the foregoing. Other Rules and Statutes apply, including but not limited to 12 U.S.C. § 2605 and 15 U.S.C §1692.

## II. Parties Known and Unknown

3. There are multiple known and unknown stakeholders with potential claims relating to the subject Property and "mortgage loan " (hereafter the Transaction). Plaintiff seeks discovery as to exactly who these stakeholders and other parties are, what their respective rights are under the law, and how much, if anything, he owes each of them.

4. Plaintiff is a resident of the State of California living in and otherwise using and occupying his home located at 153 Western Avenue, Glendale, CA 91201 (hereafter the "Property").

5. Defendant WELLS FARGO is and was, at all times material hereto, a corporation doing

business in the State of California. Defendant WELLS FARGO is and was, at all times material hereto, the alleged "originator" and "servicer" of the Transaction.

6. Defendant LEHMAN BROTHERS INC is and was, at all times material hereto, a corporation or a bankrupt corporation doing business in the State of California. The current status and standing of Defendant LEHMAN BROTHERS INC in the instant case is unknown to Plaintiff.

7. Defendant US BANK NA is and was, at all times material hereto, a corporation or other entity doing business in the State of California and functioning as alleged trustee for another corporation or entity identified as WFMBS 2006-AR2. The current status and standing of Defendant US BANK NA in the instant case is unknown to Plaintiff.

8. Defendant FIRST AMERICAN LOANSTAR TRUSTEE SERVICES LLC is and was, at all times material hereto, a Texas entity doing business in the State of California. The current status and standing of Defendant FIRST AMERICAN LOANSTAR TRUSTEE SERVICES in the instant case is unknown to Plaintiff.

9. Defendant FIRST AMERICAN TITLE INSURANCE COMPANY is and was, at all times material hereto, a Texas entity doing business in the State of California. The current status and standing of Defendant FIRST AMERICAN TITLE INSURANCE COMPANY in the instant case is unknown to Plaintiff.

10. Defendant FIDELITY NATIONAL TITLE INS CO is and was, at all times material hereto, a corporation or other entity doing business in the State of California. The current

status and standing of Defendant FIDELITY NATIONAL TITLE INS CO in the instant case is unknown to Plaintiff.

11. Defendant WFMBS 2006-AR2 is and was, at all times material hereto, a corporation or other entity doing business in the State of California and acting as or selling a mortgage-backed investment vehicle or vehicles. The current status and standing of Defendant WFMBS 2006-AR2 in the instant case is unknown to Plaintiff.

12. None of the above named and identified Defendants appear to be creditors in the Transaction. Defendants JOHN DOES "3001- 4000" include the creditors in the Transaction and are undisclosed, unnamed and unknown investors, participants, corporate or other entities, conduits, trustees, servicers, custodians and others in a commonly-applied mortgage securitization scheme that may or may not have included the Transaction and who may or may not be investors or certificateholders in WFMBS 2006-AR2, an entity acting as or selling a mortgage-backed investment vehicle or vehicles which may or may not be secured in whole or in part by the Transaction.

13. In addition to Plaintiff's Chapter 11 case (2:09-bk-06979-PHX-RTBP) there are three (3) companion cases to the instant action, each with a similar but distinct group of "JOHN DOES", to wit:

2:09–ap–01731–RTBP (JOHN DOES 1-1000),

2:09–ap–01728–RTBP (JOHN DOES 1001-2000), and

2:09–ap–01729–RTBP (JOHN DOES 2001-3000).

01/20/2010

### III. Background Material Facts and Grounds for Complaint

Plaintiff reaffirms and realleges paragraphs 1 through 13 hereinabove as if set forth more fully hereinbelow.

14. On April 8th, 2009 three of Plaintiff's unsecured creditors filed an involuntary petition against the Plaintiff for relief under Chapter 7 of title 11 of the United States Code (the "Bankruptcy Code").

15. On May 28th, 2009 (the "Petition Date"), this Court entered an order granting Plaintiff's motion to convert to Chapter 11 thereby commencing the above-captioned case.

16. Plaintiff is operating his businesses and managing his properties as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

17. Plaintiff has subsequently filed and revised all schedules and other necessary documents, and has satisfied all of the requirements of the Bankruptcy Court and the US Trustee in the case to date.

18. The Transaction is Plaintiff's purchase of a financial product or security as set forth and illustrated by Composite Exhibit "A" (Deed of Trust and Note).

19. Plaintiff has secured the services of a mortgage audit firm which has performed a forensic review of the Transaction with the goal of determining who Plaintiff's creditors are, and how much is owed to them.

01/20/2010

20. On September 21, 2009, Plaintiff served a Qualified Written Request pursuant to the Real Estate Settlement Procedures Act 12 U.S.C. § 2605 and a Debt Validation Letter pursuant to the Fair Debt Collection Practices Act 15 U.S.C §1692 on the Defendants through their attorneys of record, where known, in a diligent attempt to clarify the above issues. No timely 20-day acknowledgement and only a partial and insufficient 60-day response to the subject request have been received as of the date of this Complaint. A Certificate of Non-Response and a Certificate of Dishonor are being filed with the appropriate authorities.

21. Plaintiff has secured the services of an expert in securitized residential mortgage products and mortgage-backed securities as set forth in Exhibit "B".

22. Plaintiff's expert witness has executed a Declaration of his findings, opinions and recommendations as set forth in Exhibit "C".

23. Based on the above, Plaintiff has received conflicting representations as to the alleged creditor's identity, and now believes a title defect or cloud on title exists thus rendering title to the Property in the Transaction unmarketable.

24. On or about January 27, 2009 a notice alleging default on the subject Transaction was recorded at the Los Angeles County Recorder's office by WELLS FARGO c/o FIRST AMERICAN LOANSTAR TRUSTEE SERVICES LLC. On the identical date, on about January 27, 2009, Defendant WELLS FARGO c/o FIRST AMERICAN LOANSTAR

01/20/2010

TRUSTEE SERVICES LLC "transferred and assigned all beneficial interest" in the Note and mortgage to Defendant US BANK AS TRUSTEE FOR WFMBS 2006-AR2.

25. Notwithstanding the above January 27, 2009 assignment and transfer, on or about July 9, 2009, Defendant WELLS FARGO instituted a proceeding to foreclose on the previously assigned and transferred mortgage as to the Property asserting Defendant WELLS FARGO'S standing as "current beneficiary" on July 9, 2009.

26. Plaintiff timely objected to and opposed Defendant WELLS FARGO'S motion for relief from the automatic stay on the grounds that Defendant WELLS FARGO was demonstrably not the current beneficiary on July 9, 2009, and lacked standing to bring an action of foreclosure. The court disagreed based on counsel's representation to the contrary, and ordered the stay lifted on October 2nd, 2009. Based on the findings of the expert, there is an obvious conflict between the representations of counsel and the expert witness, requiring inquiry and an evidentiary hearing.

27. Defendant WELLS FARGO has apparently taken the position, through representations of counsel, that either Defendant US BANK previously assigned the mortgage assigned to Defendant US BANK as to the Property back to Defendant WELLS FARGO prior to July 9, 2009, or that a photocopy of an unassigned and unendorsed 2007 note is sufficient foundation for Defendant WELLS FARGO'S July 9, 2009 foreclosure action.

28. No such assignment or endorsed and enforceable Note has been produced to the Plaintiff or the court, and Defendant WELLS FARGO has failed to prove that it is the

holder of all rights under the Note, which would permit the legal holder thereof to declare a default which would trigger a foreclosure.

29. Further, Defendant WELLS FARGO as alleged "trustee-in-fact" or "attorney-in-fact" for unnamed 'Certificateholders' of a series of mortgage-backed securities, has failed to demonstrate that it, and not the Certificateholders, is the party with the true ownership interest in the mortgage the subject of this action, or that the Certificateholders have acceded or legally assigned their rights to and under the subject mortgage to Defendant WELLS FARGO, specifically the right to seek a foreclosure.

30. As such, Defendant WELLS FARGO has not demonstrated that it has suffered an actual or threatened injury as a consequence of any default, which distinct and palpable injury is legally required under applicable Federal and State law in order for Defendant WELLS FARGO to satisfy the legal prerequisite to prove that it has a sufficient personal stake in and legal standing to institute the foreclosure on the Property.

31. As a severance of the ownership and possession of the original Note and Mortgage has occurred and as the true owner and holder of both the original Note and Mortgage are unknown as a result of one or more alleged assignments and the parsed sale of certain rights under the Note in part to at least two third parties (Defendant LEHMAN BROTHERS and Defendant US BANK), Defendant WELLS FARGO is legally precluded from foreclosing on the Property unless and until it can demonstrate full legal standing to do so.

32. As set forth above, Defendant WELLS FARGO is only the alleged "servicer" of the Note, and as such cannot institute or maintain a foreclosure proceeding.

01/20/2010

33. As set forth above, if discovery shows another entity or person to be the current beneficiary under the Note, Defendant WELLS FARGO cannot institute or maintain a foreclosure proceeding.

34. Plaintiff served his First Set of Interrogatories and First Request to Produce Documents on Defendants on January 11, 2010 as set forth in Exhibit "D".

35. This Complaint is being timely filed in accordance with applicable law to challenge the foreclosure prior to the scheduled January 20, 2010 Trustee Sale or the issuance of any Certificate of Title following sale.

**IV. RELIEF SOUGHT**

Plaintiff reaffirms and realleges paragraphs 1 through 35 hereinabove as if set forth more fully hereinbelow.

36. Plaintiff requests a hearing on the merits, based on the rules of evidence and founded on common discovery and enforcement in obtaining relevant information about his loan.

37. Plaintiff seeks discovery as to exactly who are the multiple stakeholders and other parties with potential claims relating to the subject Property and Transaction, what their respective rights are under the law, and how much, if anything, he owes each of them.

38. Plaintiff requests discovery pursuant to Bankruptcy Rules 7026 through 7037 and

01/20/2010

F.R.C.P 26 through 37 including but not limited to enforcement of the Real Estate Settlement Procedures Act Qualified Written Request and the Fair Debt Collection Practices Act Debt Validation Letter to test the merits of Defendant WELLS FARGO 'S allegation that they have the right to enforce the note.

39. Plaintiff seeks a complete accounting from those individuals, entities or parties involved in the origination, servicing, and securitization of the Transaction, so that he can discover what undisclosed fees were paid under TILA and RESPA, and the true identities of the individuals and entities involved in Plaintiff's table-funded "loan".

40. Plaintiff seeks the disclosure of the identity(ies) of the creditor(s) who actually funded the Transaction, and the production of documents and names, addresses and phone numbers of people who can testify under oath at the evidentiary hearing.

41. Plaintiff requests the opportunity to admit evidence, including but not limited to the results of a forensic analysis of the Transaction and documents on record at the Los Angeles County Recorder's office.

42. Plaintiff requests the opportunity to present expert witness Neil F. Garfield, MBA, JD, a pre-eminent authority on securitized residential mortgage products and mortgage-backed securities, or other expert witness, at the evidentiary hearing or hearings.

43. Plaintiff requests that the Court give serious consideration to Dr. Garfield's expert opinions and testimony as they apply to Plaintiff's situation as well as to the situation of millions of other homeowners.

01/20/2010

44. Plaintiff requests a declaratory judgment relating to the foregoing,

45. Finally, Plaintiff requests that the court impose a temporary restraining order enjoining Defendants from taking any further foreclosure, sale or other judicial or non-judicial action before the resolution of the foregoing, thereby maintaining the status quo at least until discovery has been conducted.

WHEREFORE, Plaintiff respectfully requests that the Court order and grant (a) an evidentiary hearing on the merits, and (b) discovery and enforcement in obtaining all relevant information, and (c) enforcement of the disclosure requirements and default clauses of the Real Estate Settlement Procedures Act and the Fair Debt Collection Practices Act, and (d) the production of documents, and (f) the opportunity to bring an expert witness or witnesses before the court, and (g) a declaratory judgment relating to the foregoing, and (f) a temporary restraining order as set forth above, and (e) such other and further relief as may be just and proper.

Dated January 14th, 2010

**Andrew C. Bailey, Plaintiff**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF ARIZONA

NOTICE THAT EITHER EXHIBITS TO THIS ELECTRONICALLY FILED
DOCUMENT ARE NOT ATTACHED OR ALL PAGES OF THIS DOCUMENT ARE
NOT ATTACHED.

There were either one or more exhibits and/or other attachments filed with this pleading
or the document filed consisted of pages too numerous for the clerk to scan and
electronically file as part of the pleading. Paper copies of the exhibits or the entire
document are maintained at the Office of the Clerk. They may be reviewed at that office
9:00 a.m. to 4:00 p.m., Monday to Friday, at 230 North First Avenue, Suite 101, Phoenix,
Arizona.

BRIAN D. KARTH
CLERK OF COURT

12/2/05

2

Recording Requested By:
WELLS FARGO BANK, N.A.

05 2946072

Return To:
WFHM FINAL DOCS X9999-01M

1000 BLUE GENTIAN ROAD
EAGAN, MN 55121
Prepared By:
WELLS FARGO BANK, N.A.

16644 WEST BERNARDO DR., STE
101, SAN DIEGO, CA ———————— [Space Above This Line For Recording Data]—————————

5F034043 - P7
5626.005-004        DEED OF TRUST

# DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated NOVEMBER    , 2005
together with all Riders to this document.

(B) "Borrower" is

    CONSTANCE BAXTER MARLOW, AN UNMARRIED WOMAN, AS TO AN UNDIVIDED
    50% INTEREST AND ANDREW CAMERON BAILEY, A MARRIED MAN AS HIS SOLE
    AND SEPARATE PROPERTY, AS TO AN UNDIVIDED 50% INTEREST, AS
    TENANTS IN COMMON

Borrower is the trustor under this Security Instrument.

(C) "Lender" is WELLS FARGO BANK, N.A.

Lender is a NATIONAL ASSOCIATION
organized and existing under the laws of THE UNITED STATES
0060412178

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3005 1/01

-6(CA) (0005)      ACB
Page 1 of 15      CBM
VMP MORTGAGE FORMS - (800)521-7291



Composite
Exhibit  A
1 & 2
1. Deed of Trust

01/20/2010

3

Lender's address is P.O. BOX 10304, DES MOINES, IA  503060304

Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is FIDELITY NATIONAL TITLE INS CO
17911 VON KARMAN, SUITE 200, IRVINE, CA  92614
(E) "Note" means the promissory note signed by Borrower and dated NOVEMBER 16, 2005
The Note states that Borrower owes Lender FOUR HUNDRED EIGHTY THOUSAND AND 00/100

Dollars

(U.S. $****480,000.00     ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than DECEMBER 01, 2035
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

[x] Adjustable Rate Rider  [ ] Condominium Rider          [ ] Second Home Rider
[ ] Balloon Rider          [ ] Planned Unit Development Rider  [ ] 1-4 Family Rider
[ ] VA Rider               [ ] Biweekly Payment Rider     [ ] Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

VMP®-6(CA) (0009)                          Page 2 of 15          Initials CBM ACB          Form 3005  1/01

05 2946072

4

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **COUNTY**                                    of **LOS ANGELES**                                    :

[Type of Recording Jurisdiction]                                    [Name of Recording Jurisdiction]

**LEGAL DESCRIPTION ATTACHED HERE TO AND MADE A PART HEREOF:**

SEE EXHIBIT "A" ATTACHED

**\*SEE ADJUSTABLE RATE RIDER**

**TAX STATEMENTS SHOULD BE SENT TO: WELLS FARGO HOME MORTGAGE, P.O. BOX 10304, DES MOINES, IA 503060304**

Parcel ID Number: **5626-005-004**                              which currently has the address of
**153 WESTERN AVENUE**                                                                     [Street]
**GLENDALE**                                                   [City], California **91201**          [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.



-6(CA) :0005)                              Page 3 of 15          Initials: CSH AcB          Form 3005  1/01

**05 2946072**

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

Initials CBM  NB

.05 2946072

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

 -6(CA) (0005)     Page 5 of 15     Initials           Form 3005  1/01

**05 2946072**

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

 

**05 2946072**

01/20/2010

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable



05 2946072

01/20/2010

9

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for **Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

-6(CA) (0005)     Page 8 of 15     Initials:      Form 3005  1/01

**05 2946072**

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender



05 2946072

01/20/2010

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.



**05 2946072**

01/20/2010

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA



05 2946072

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

05 2946072

14

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

 -6(CA) (0005)

Page 13 of 15



Form 3005  1/01

05 2946072

BY SIGNING BELOW. Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
ANDREW CAMERON BAILEY          -Borrower

_____

_____ (Seal)
CONSTANCE BAXTER MARLOW         -Borrower

_____ (Seal)       _____ (Seal)
           -Borrower                          -Borrower

_____ (Seal)       _____ (Seal)
           -Borrower                          -Borrower

_____ (Seal)       _____ (Seal)
           -Borrower                          -Borrower

05 2946072

01/20/2010

# EXHIBIT A

16

LOT 4, BLOCK 6 TRACT NO. 10116, IN THE CITY OF GLENDALE, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS SHOWN BY MAP ON FILE IN BOOK 143 PAGES 98 AND 99 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

05 2946072

State of California
County of } ss.

On _____ before me,

personally appeared

ANDREW CAMERON BAILEY CONSTANCE BAXTER MARLOW

, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____ (Seal)

STEPHANIE BOGAN
Notary Public - Arizona
Maricopa County
My Commission Expires
August 28, 2009

STATE OF ARIZONA
COUNTY OF _Maricopa_
The foregoing instrument was acknowledged
before me this 17th day of _Nov._, 2005
By _Andrew Cameron Bailey & Constance Baxter Marlow_
Notary Public _____
My Commission Expires _Aug. 28 2009_.

-6(CA) 0305)                     Page 15 of 15                Form 3005  1/01

**05 2946072**

STATE OF _Arizona_ } SS.

COUNTY OF _Maricopa_

On _Nov 17th, 2005_, before me, _Stephanie Bogan_

PERSONALLY APPEARED _Andrew Cameron Bailey_

_Constance Baxter Marlow_

_personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument._

WITNESS my hand and official seal.

Signature _Stephanie Bogan_

**STEPHANIE BOGAN**
Notary Public - Arizona
Maricopa County
My Commission Expires
August 28, 2009

_This area for Official Notarial Seal_

━━━━━ **OPTIONAL** ━━━━━

Though the data below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent reattachment of this form.

CAPACITY CLAIMED BY SIGNER

☐ INDIVIDUAL
☐ CORPORATE OFFICER

_____
TITLE(S)

☐ PARTNER(S)    ☐ LIMITED
                ☐ GENERAL
☐ ATTORNEY-IN-FACT
☐ TRUSTEE(S)
☐ GUARDIAN/CONSERVATOR
☐ OTHER: _____

_____
_____

SIGNER IS REPRESENTING:
NAME OF PERSON(S) OR ENTITY(IES)

_____
_____

DESCRIPTION OF ATTACHED DOCUMENT

_____
TITLE OF TYPE OF DOCUMENT

_____
NUMBER OF PAGES

_____
DATE OF DOCUMENT

_____
SIGNER(S) OTHER THAN NAMED ABOVE

ID-1232 (REV. 5/01)    ALL-PURPOSE ACKNOWLEDGEMENT

**05 2946072**

# ADJUSTABLE RATE RIDER
(1-Year Treasury Index - Rate Caps)
(Assumable after Initial Period)

THIS ADJUSTABLE RATE RIDER is made this 16 day of **NOVEMBER 2005** , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure the Borrower's Adjustable Rate Note (the "Note") to **WELLS FARGO BANK, N.A.**

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:
**153 WESTERN AVENUE, GLENDALE, CA 91201**

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:
**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of 5.500 %. The Note provides for changes in the interest rate and the monthly payments as follows:
**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
    **(A) Change Dates**
    The interest rate I will pay may change on the first day of **DECEMBER, 2010** , and may change on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date."
    **(B) The Index**
    Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."
    If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.
0060412178
**MULTISTATE ADJUSTABLE RATE RIDER - 1-Year Treasury Index (Assumable after Initial Period) - Single Family - Freddie Mac UNIFORM INSTRUMENT** Form 5110 3/04
-834R (0405).01
Page 1 of 4          Initials:
VMP Mortgage Solutions, Inc. (800) 521-7291
NMFL #8361 (FM5R) Rev 12/8/2004

**05 2946072**

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding
TWO AND THREE-QUARTERS                                                    percentage point(s)
(                2.75 %) to the Current Index. The Note Holder will then round the result
of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the
limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the
next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be
sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full
on the maturity date at my new interest rate in substantially equal payments. The result of
this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than
            10.500 % or less than              2.750 %. Thereafter, my interest rate will
never be increased or decreased on any single Change Date by more than
TWO                                                                      percentage point(s)
(                2.000 %) from the rate of interest I have been paying for the preceding
12 months. My interest rate will never be greater than              10.500 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount
of my new monthly payment beginning on the first monthly payment date after the Change
Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and
the amount of my monthly payment before the effective date of any change. The notice will
include information required by law to be given to me and also the title and telephone number
of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

**1. UNTIL BORROWER'S INITIAL INTEREST RATE CHANGES UNDER THE TERMS
STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT
SHALL BE IN EFFECT AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this
Section 18, "Interest in the Property" means any legal or beneficial interest in the
Property, including, but not limited to, those beneficial interests transferred in a
bond for deed, contract for deed, installment sales contract or escrow agreement,
the intent of which is the transfer of title by Borrower at a future date to a
purchaser.

If all or any part of the Property or any Interest in the Property is sold or
transferred (or if Borrower is not a natural person and a beneficial interest in
Borrower is sold or transferred) without Lender's prior written consent, Lender may
require immediate payment in full of all sums secured by this Security Instrument.
However, this option shall not be exercised by Lender if such exercise is prohibited
by Applicable Law.

Initials: ACR
CBM

VMP-834R (0405).01          Page 2 of 4          Form 5110 3/04

05 2946072

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**2. AFTER BORROWER'S INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION B1 ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND THE PROVISIONS OF UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL BE AMENDED TO READ AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.



Initials:

-834R (0405).01          Page 3 of 4          Form 5110 3/04

**05 2946072**

22

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

11/13/05 ACB
11/17/05

_____ (Seal)      _____ (Seal)
ANDREW CAMERON BAILEY        -Borrower    CONSTANCE BAXTER MARLOW     -Borrower

_____ (Seal)      _____ (Seal)
                         -Borrower                           -Borrower

_____ (Seal)      _____ (Seal)
                         -Borrower                           -Borrower

_____ (Seal)      _____ (Seal)
                         -Borrower                           -Borrower

05 2946072

01/20/2010

23

# CERTIFICATION PURSUANT TO GOVERNMENT CODE SECTION 27361.7

SAN DIEGO
_____
Place of Execution

I certify under penalty of perjury that this material is a true copy of the original material contained in this document.

12·1·05
_____
Date

_____
Signature of Declarant

JOHN R HALL
_____
Type or Print Name

05 2946072

01/20/2010

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**

STATE OF CALIFORNIA _____ } SS
COUNTY OF _____

On _____ before me, _____ ,

personally appeared _____ ,
                                               NAME(S) OF SIGNER(S)

    personally known to me    - OR - proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
SIGNATURE OF NOTARY

**OPTIONAL**

Though the data below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent reattachment of this form.

**CAPACITY CLAIMED BY SIGNER**
    INDIVIDUAL
    CORPORATE OFFICER

_____
TITLE(S)
PARTNER(S)
LIMITED or GENERAL
ATTORNEY-IN-FACT
TRUSTEE(S)
GUARDIAN/CONSERVATOR
OTHER:

**SIGNER IS REPRESENTING:**
NAME OF PERSON(S( OR ENTITY(IES)
_____
_____

**DESCRIPTION OF ATTACHED DOCUMENT**

_____
TITLE OR TYPE OF DOCUMENT

_____
NUMBER OF PAGES

_____
DATE OF DOCUMENT

_____
SIGNER(S) OTHER THAN NAMED ABOVE

05 2946072

# INITIAL INTEREST<sup>SM</sup> ADJUSTABLE RATE NOTE

INITIAL INTEREST<sup>SM</sup>ADJUSTABLE RATE NOTE
## (1-Year Treasury Index - Rate Caps)
### (Assumable after Initial Period)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

NOVEMBER 07, 2005          SAN DIEGO                    CALIFORNIA
   [Date]                              [City]                                    [State]

153 WESTERN AVENUE, GLENDALE, CA  91201

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ *****480,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **WELLS FARGO BANK, N.A.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of         5.500 %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will make a payment every month on the first day of the month beginning on **JANUARY 01, 2006**
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and if the payment consists of both principal and interest, it will be applied to interest before Principal. If, on **DECEMBER 01, 2035**                   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **WELLS FARGO HOME MORTGAGE, P.O. BOX 10304, DES MOINES, IA 503060304**
or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Before the first fully amortizing principal and interest payment due date stated in subsection (C) below (the "First P&I Payment Due Date"), my monthly payments will be only for the interest due on the unpaid principal of this Note.

Each of my initial monthly payments will be in the amount of U.S. $ *********2,200.00         . This amount may change in accordance with subsection (C) below.

### (C) Monthly Payment Changes

The First P&I Payment Due Date is                    01/01/16

0060412178
NMFL #8380 (MS1C) Rev 5/9/2005
MULTISTATE INITIAL INTEREST ADJUSTABLE RATE NOTE - 1-Year Treasury Index (Assumable after Initial Period) - Single Family - Freddie Mac UNIFORM INSTRUMENT

VMP®-191N (0501)
VMP Mortgage Solutions, Inc. (800)521-7291
Page 1 of 5                    Initials: ACB



Composite
Exhibit A
1 & 2
2. Note

01/20/2010

Prior to the First P&I Payment Due Date, my monthly payment may change to reflect changes in the interest rate I must pay in accordance with Section 4 of this Note or to reflect changes in the unpaid principal of my loan in accordance with Section 5 of this Note. Notwithstanding the provisions of Section 4(C) of this Note to the contrary, prior to the First P&I Payment Due Date the Note Holder will not include in the monthly payment any amount to repay the unpaid principal. Before the effective date of any change in my monthly payment, the Note Holder will deliver or mail to me a notice of the change in accordance with Section 8 of this Note. The notice will include the title and telephone number of a person who will answer any question I may have regarding the notice.

Beginning with the First P&I Payment Due Date, my monthly payment will change to an amount sufficient to repay the principal and interest at the rate described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Sections 4 and 5 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A) Change Dates

The interest rate I will pay may change on the first day of **DECEMBER, 2010**                              , and may change on that day every 12th month thereafter. Each date on which my interest rate could change is called an "Interest Change Date."

(B) The Index

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **TWO AND THREE-QUARTERS**                percentage point(s) (                **2.750** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Interest Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Interest Change Date will not be greater than                **10.500** % or less than                **2.750** %. Thereafter, my interest rate will never be increased or decreased on any single Interest Change Date by more than **TWO**                percentage point(s) (                **2.000** %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than                **10.500** %.

(E) Effective Date of Changes

My new interest rate will become effective on each Interest Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to the changes.


01/20/2010

If I make a partial Prepayment during the period ending with the due date of my last interest only monthly payment, my partial Prepayment will reduce the amount of my monthly payment. If I make a partial Prepayment after the last interest only monthly payment, my partial Prepayment may reduce the amount of my monthly payments beginning with the monthly payment due after the Interest Change Date following the partial Prepayment. After the first Interest Change Date, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000** % of my overdue payment of interest during the period when my payment is interest only, and of principal and interest after that. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

01/20/2010

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)                    _____ (Seal)
ANDREW CAMERON BAILEY          -Borrower                                                  -Borrower

_____ (Seal)                    _____ (Seal)
                               -Borrower                                                  -Borrower

_____ (Seal)                    _____ (Seal)
                               -Borrower                                                  -Borrower

_____ (Seal)                    _____ (Seal)
                               -Borrower                                                  -Borrower

*[Sign Original Only]*

01/20/2010

## RESUME

# *NEIL F. GARFIELD*

*4980 S Alma School Rd A-2*
*480-895-5443 Fax: 772-594-6244*
*email: Ngarfield@msn.com*

## SUMMARY:

Varied and integrated professional and business background in the following areas --- *investment banking, derivative security baskets, electronic funds transfer, management, information systems, accounting, auditing and law.*

- ✓ Currently teaching lawyers, judges, legislators, and layman in the Garfield Continuum Seminars for Attorney CLE credit and general information, appearing on numerous radio and TV broadcasts, Garfield is the Editor in Chief of livinglies.wordpress.com, a blog site that has reached over 1 million visits and is widely regarded as the premier resource on the internet for foreclosure cases, opinion, links to law reviews, practice guides and current events the foreclosure of securitized mortgages. Garfield draws on his Wall Street experience and trial lawyer years combined with intensive analysis of derivatives, securitized financial products and personal relationships developed over the years which give him unique insights into the realities of Wall Street in the Mortgage Meltdown of 2001-2009.

- ✓ Starting out on **Wall Street,** he became proficient in the language and conduct of highly complex financial transactions. At an early age, Mr. Garfield personally handled the negotiations leading to successful **mergers, acquisitions, multimillion dollar financing, IPO's, secondary offerings, and private financing** for dozens of companies.

- ✓ He then achieved his **MBA and JD degrees with distinction,** and began a 35 year law and business consulting career.

- ✓ Following his law career he assumed control of two **public companies** for which he successfully structured financing and merger programs, **creating and implementing novel business and marketing plans for information systems** storage and retrieval including a mobile platform for backfile conversion for clients who were installing imaging systems. Initial clientele included **Fannie Mae, Chemical Bank, the Securities and Exchange Commission, the New Mexico Legislature,** and a host of Universities and Government agencies. Under his direction the publicly traded stock increased market value from **$150,000 to $45,000,000** in nine months.

- ✓ Following that engagement, he bought out the **ATM/POB portfolios** of several different companies now consolidated under EFT Systems, Inc., d/b/a American Bank Card, which now manages more than **$30 million** in electronic payments for retail sales, an **increase of 250%.** The EFT's **business expanded** to include **prepaid debit cards, ACH origination, and technology consulting** to banks and independent sales organizations.

- ✓ As president of American Bank Card, he created, funded and implemented the business plan for a cooperative marketing channel to community banks for technology sales, deployment, and support. He is now **General Counsel to the SMART cooperative of community banks** that includes a newly launched bank network, and a host of electronic funds transfer services on behalf of bank and private enterprise clients.

Exhibit B

01/20/2010

**WALL STREET BACKGROUND:**

With a family securities business in his background (Garfield and Co. Members NYSE, AMEX etc.) Mr. Garfield started off as a trainee securities analyst and quickly rose to be Director of Research and Director of Mergers and Acquisitions at well-respected brokerage houses on Wall Street. At the end of this portion of his career, Mr. Garfield concurrently studied for his **MBA** *magna cum laude.* He was licensed as a registered representative 1968-1972.

**LAW CAREER**

Following his investment banking career, Mr. Garfield moved to Florida where he studied law and was awarded his **JD degree** *cum laude.* Concurrently with his studies, he was the business manager for a small law firm in Fort Lauderdale.

A member of the **Florida Bar** since 1977, he devoted most of his time to practicing law from 1977 through 1992. He is also a member of the **Federal Trial Bar**, the Federal Bankruptcy Bar, and several national and local committees. Until his semi-retirement in December, 1992 he was also a member of The Florida Trial Lawyers Association, the American Bar Association and the West Broward Bar Association. He has served on committees for the Florida Bar and was a volunteer, early in his legal career for the Florida Bar Committee for mental disability law reform, where he represented individuals incarcerated for reasons associated with mental disabilities (pro bono).

He received his Undergraduate Degree from Dickinson College in 1968, his MBA from Iona College in 1974, Magna Cum Laude, and his Juris Doctor from Nova University Center for the Study of Law in 1977, Cum Laude.

   The concentration of his law practice was in the areas of commercial transactions, commercial litigation, condominium law, administrative law and bankruptcy. He has been the recipient of **numerous academic awards** in business and law, including:

> **LAW**
> *American Jurisprudence Award in Torts
> *American Jurisprudence Award in Commercial Transactions
> *American Jurisprudence Award in Federal Jurisdiction
> *Horn Book Award for outstanding scholastic achievement from Nova University Law Center
> (first out of 175 students)
> **BUSINESS, ACCOUNTING AND TAXATION**
> *Medal for Academic Excellence 1974, MBA, (first in a two-year program of 159 students)
> *Who's Who Among Students in American Universities and Colleges - 1974 - Iona College

Concurrently with his law career, he was frequently retained as a **business consultant** to small and medium sized businesses. Mr. Garfield assumed the Presidency of two public companies in 1992 and was charged with the responsibility of finding and closing on mergers, acquisitions, financing, and developing the business plans of those entities through the acquisition of qualified personnel. At the commencement of his engagement, neither company had any assets other than loosely defined business plans. In an 18 month period these companies **raised over $2.5 million in cash, made acquisitions for real estate valued in excess of $8 million,** and acquired several operating companies. In addition, the business plans of the companies were refined, placing DIS as the leading company in the field of backfile conversion (conversion of hard copy documents into computer storage) and consulting on information systems, storage and retrieval. During that tenure he managed 45 employees.

1968 - 1969: Director Research Department, and Registered Representative, Spingarn, Heine Company, Members, NYSE, AMEX, etc.

1968 Trainee - Security Analyst and Registered Representative, A.L. Stamm & Company, Members, NYSE, AMEX, etc.

## TEACHING AND PUBLIC SPEAKING EXPERIENCE:

1. Iona College **Graduate School** of Business Administration: Taught individual classes in a variety of management, auditing and accounting courses as substitute for usual professor.

2. Broward Community **College**: Taught variety of subject dealing with law and business for adult education. Guest lecturer on business, law, and psychology of learning and performance.

3. **Seminars**: Conducted numerous seminars in law, business and personal development. Methods employed: lecture, Socratic and experiential. Garfield Continuum Seminars on Foreclosure Defense, Litigation and Securitized Mortgages is qualified for Continuing Legal Education Credits in 26 states varying from 6.5 to 9.5 credits.

4. **Trials**: Every trial is an educational seminar for the jury or judge. In the course of 17 years of practice, has appeared as lead counsel in over 2000 contested hearings, bench trials and jury trials and approximately 20 oral arguments on appeal.

5. **Radio**: In 1985-1986, host of several radio programs, including the Neil Garfield Condo Connection show on what was then WGBS. This program dealt with educating the public concerning the law and practice as it related to living in condominiums, cooperatives, and home owner associations.

6. **Television**: Periodically over the years has appeared as the spotlighted guest or on a panel on PBS and other stations relating to condominium law, administrative law, and general business subjects.

7. *Currently preparing curriculum for seminar and matriculated course offerings in electronic commerce and electronic banking.*

## PERSONAL:

Married December 6, 2003 to Joyce Molloy Children: Marc Andrew Garfield DPM (40, prior marriage, **Podiatrist**) Virginia beach, Va., Chelsea Lauren Garfield (35, prior marriage, Director of Website for Citizens property Insurance, Florida, Danielle Kinorah Garfield, age 20, attending Broward Community College, Cocnut Creek, FloridaAmerican Heritage School in Plantation, Florida. Brother, Gary J. Garfield, M.D., is a practicing **Cardiologist** in Coral Springs, Florida. Father, Frederick M. Garfield, M.D., was a retired **Physician**. Cousin, Brian Garfield is an **Author** in Hollywood, California ("Death Wish,", "Hopscotch", "Kolchak's Gold," etc.). Hobbies include music (keyboard player), reading and travel. The Garfield family created the **first fully U.S. automated pharmaceutical plant** at the beginning of this century. It is now an exhibit at the Smithsonian Institute in Washington, D.C.. The family also created and patented the process by which lanolin is extracted from cholesterol, providing the base for all cosmetics and paints made in the world.

**ANDREW C. BAILEY**
2500 N. Page Springs Rd

Cornville, AZ 86325

928 634-4335

*Debtor in Pro Per*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Andrew C. Bailey<br><br>Plaintiff | **Chapter 11** |
|  | **Case# 2:09–ap–01727–RTBP** |
| vs.<br><br>WELLS FARGO BANK, NA.<br>US BANK, NA<br>LEHMAN BROTHERS BANK<br>ET AL<br><br>Defendants | **DECLARATION OF NEIL FRANKLIN GARFIELD AS EXPERT WITNESS** |

STATE OF ARIZONA    )
                       )   ss.
County of Maricopa    )

Neil Franklin Garfield, deposes and states unsworn under penalty of perjury as follows:

1.      I am over the age of eighteen years and qualified to make this affidavit.

2.      I have been a licensed member in good standing of the Florida Bar FBN 229318

1

Exhibit C

since May 31, 1977

3.    I am the author and editor of www.livinglies.wordpress.com a blog site on the
Internet which contains most of the public records and public domain reports,
articles, books, treatises and documentation upon which I rely for my opinion in this
case. I am the author of the manuals and workbooks that are used to accompany
the workshops and seminars that present under the name GARFIELD
CONTINUUM. Those manuals are the nearest thing available in the marketplace to
treatises involving foreclosure of securitized residential mortgages. In addition I have
an indirect interest in Foreclosure Defense Group that performs forensic analysis of
loan documents, title examinations, analysis of securitization documentation, and
prepares Qualified Written Requests, Debt Validation Letters and demand letters for
clients, most of whom are attorneys licensed in the jurisdiction in which the subject
property is located. Foreclosure Defense Group sponsors the Garfield Continuum
Seminars in which I teach laymen and lawyers to understand civil procedure,
evidence, motion practice, discovery, ethics, securitization theory and practice,
defensive and offensive strategies with servicers, MERS, Trustees, mortgage
brokers, "originating lenders," investment bank underwriters, special purpose
vehicles and bond issuance. Subjects also include elements of property law,
contract law, negotiable instruments, Uniform Commercial Code, tort law and
consumer protection under Federal and State enabling legislation.

4.    I have recently testified at deposition as an expert in the class action suit in Case

2

No.: 3:09-cv-180-ECR-VPC, United States District Court District of Nevada,[1] to render opinions in the topic areas related to the securitization of mortgage loans, derivative securities, the securities industry; real property law, Uniform Commercial Code practices, predatory lending practices, Truth in Lending Act requirements, loan origination and underwriting, accounting in the context of securitization and REMIC entities, Special Purpose Vehicles, Structured Investment Vehicles, pooling and servicing of securitized loans, assignment and assumption of securitized residential mortgage loans, creation of trusts under deeds of trust, pooling agreements, and issuance of asset backed securities and specifically mortgage-backed securities by special purpose vehicles in which an entity is named as trustee for the holders of certificates of mortgage backed securities, the economics of securitized residential mortgages during the period of 2001-2008, appraisal fraud and its effect on APR disclosure, usury, exceeding the legal limit for interest charged, non-judicial foreclosure of securitized and non-securitized residential mortgages, and judicial foreclosure of securitized and non-securitized residential mortgages, all particularly as to the laws of the State of Arizona, California, Florida and Ohio, based upon the

1        JOSEFA S. LOPEZ, JOSE TRINIDAD CASAS, MARIA C. CASAS, LYNDON B.GRAVES, TYRONE EVENSON, MICHELLINA EVENSON, BRYAN GRAY, HELEN GRAY, PATRICK FRANKOSKI, and CHRISTOPHER PETERNELL, individually and on behalf of a class of similarly situated individuals, Plaintiffs vs. EXECUTIVE TRUSTEE SERVICES, LLC.; COUNTRYWIDE HOME LOANS, INC., a New York corporation; MERSCORP, INC., a Virginia corporation; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., a subsidiary of MERSCORP, Inc., a Delaware  corporation; RECONTRUST, SAXON MORTGAGE SERVICES, INC., a Pennsylvania corporation; GALE GROUP dba T.D. FINANCIAL SERVICES dba T.D. SERVICE COMPANY, SECURITY UNION TITLE INSURANCE COMPANY, CAPITAL ONE dba CHEVY CHASE BANK, NATIONAL DEFAULT SERVICING CORPORATION, FEDERAL HOME LOAN MORTGAGE CORPORATION, a Virginia corporation; FEDERAL NATIONAL MORTGAGE ASSOCIATION, a District of Columbia corporation; GMAC MORTGAGE, L.L.C., a Delaware corporation; NATIONAL CITY  MORTGAGE, a foreign company and a division of NATIONAL CITY BANK, a subsidiary of National City Corporation; NATIONAL CITY CORPORATION, a Delaware corporation and a subsidiary of PNC Financial Services, Inc.; PNC FINANCIAL SERVICES, INC., a Pennsylvania corporation; J.P. MORGAN CHASE BANK, N.A., a New York corporation; CITIMORTGAGE, INC., a New York corporation; HSBC MORTGAGE CORPORATION, U.S.A., a Delaware corporation; AIG UNITED GUARANTY CORPORATION, a foreign corporation; WELLS FARGO BANK, N.A., a California corporation, d/b/a WELLS FARGO HOME EQUITY and d/b/a WELLS FARGO HOME MORTGAGE, a division of WELLS FARGO BANK, N.A., a California corporation; BANK OF AMERICA, N.A., a Delaware corporation, and GE MONEY BANK, an Ohio corporation;  JOHN AND JANE

3

credentials in the Resume attached hereto.

5.    I have no direct or indirect interest in the outcome of the case at Bar for which I am offering my observations, analysis, opinions and testimony. The cost of my preparation, analysis, review, meetings, teleconferences, appearances and all other work is $500 per hour plus all out of pocket expenses all of which must be prepaid regardless of outcome.

6.    With respect to **Case #: 2:09-bk-06979-PHX-RTBP and related matters in administrative and judicial proceedings** I have received and reviewed some of the pleadings and memorandums, some of the orders entered, conferred with the forensic analyst that reviewed the purported loan closings on the subject properties, the closing loan documents and additional pleadings relating to the subject "loan" transactions. I have confirmed the information related to me through my review of said closing documentation, as well as my own internet searches with respect to the parties purporting to be the "Lender" (see end-note 1) in the transaction subject to the instant matters.

7.    My opinions are based upon public records and documentation written or prepared by the purported originating parties that are named or designated as a "lender"[i] or "beneficiary" or "Payee" or "trustee" in the contracts and deed executed by the homeowner in this case, as well as the documentation that in my opinion was relevant to the securitization of the financial product sold to the homeowner as a residential home loan and simultaneously or contemporaneously sold as a financial

---

DOES I-X;  BLACK AND WHITE PARTNERSHIP I-X.

4

product to an investor. In my opinion, both financial products (i.e., the transaction with the property owner and the transaction with the creditor/investor who purchased mortgage-backed bonds from an entity that was not disclosed at closing to the property owner) were securities, and neither set of securities were properly registered or regulated. The information that would reveal the identity(ies) of the creditor(s) has been withheld from Debtor. It can only be said, in the context of an absence of answers to the qualified written requests that the creditor can be described but not identified. The initiating parties in foreclosure are not creditors and do not appear to have ever advanced money, goods or services, nor did they enter into any arrangement wherein they expected payment to be due to them. Rather, as is apparent from the information at hand, the payment was, as is always the case, due to the creditor who advanced the money or his/her/its successor. The parties have assumed the identity of "beneficiary", "lender" and/or "payee" despite the fact that the loan was securitized which means that it was sold to investors who were the source of the advance of funds. Since the sale of bonds to the investor is customarily a transaction that precedes the sale of the financial product sold to the property owner, it is my opinion that it may be fairly and reasonably assumed that at the time the documents were executed, the creditor was the bond holder, contrary to the nominal designations on the closing documents.

8.    The customary practice in securitization of residential mortgage loan products was to withhold information concerning the identity of the creditor and to withheld the disclosure of profits and fees made on the multiple yield spreads and premiums paid

5

thereon, amounting in this case to a substantial portion of the total principal of the loans themselves, using average data from the marketplace congruent with the time and place of these transactions. The actual information that would provide the identity of the creditor and thus allow inquiry for a complete accounting and audit of the subject transactions is in the sole care, custody and control of the loan servicer or another intermediary conduit in the securitization chain, including but not limited to the Trustee or depositor for the Special Purpose Vehicle that re-issued the homeowner's note and encumbrance as a derivative hybrid debt instrument (bond) and equity instrument (ownership of percentage share of a pool of assets, of which the subject loan was one such asset in said pool).

8.1.    According to information from Debtor, Debtor has made unsuccessful attempts through industry standard letters requesting the identity of the lender, the documentation authenticating the identity of the lender, and an accounting from the lender as to all money paid or received in connection with the subject obligation.

8.2.    At such time that the intermediary participants in the securitization comply with the requests for said information, I will be able to identify with certainty the true owner of the alleged obligation, thus enabling me to provide the court with a complete description of the entire transaction starting with the creditor and ending with the debtor and any co-obligors or other conditions added during the process of securitization of the loan product sold to the property owner. In such event the identity of the creditor(s) and the opportunity to obtain a full accounting

6

will be present. Until then, I am dealing with only partial information in that there are four parts to the required accounting:

8.2.1. The debits and credits arising from the moment of the closing of the subject transactions

8.2.2. The debits and credits arising from transactions between the property owner and each servicer

8.2.3. The debits and credits arising from transactions with third parties either during or after the first phase of securitization was completed

8.2.4. The debits and credits arising from transactions in which insurance proceeds or other third party proceeds were received and distributed including the Federal Reserve, Federal Agencies, the U.S. Department of the Treasury, The FDIC and other unknown and therefore unnamed parties.

8.3. Until such time as the full accounting is available and subject to audit, it is impossible to know the amount due from the property owner on the obligation that might have been created at the alleged closing of the subject transactions.

8.4. Without knowing the amount due on the obligation it is therefore impossible to determine whether a default exists, and if so, who is suffering financial loss as a result of the default.

8.5. Until such time that the identity is revealed by Defendants, I must rely upon internet searches making certain presumptions regarding the subject loan transactions. The main presumptions are that the standards of the industry were followed in the securitization of the subject transaction and that the subject

7

transactions were in fact securitized. I arrive at those conclusions both from information appearing in the record and from my knowledge that where these particular parties are involved, the probability of securitization is nearly 100%. The prospectus that was filed with the SEC apparently covering the parties and time period consistent with the Bailey "Loan" Transaction reveals explicit terms and conditions upon which I base my opinions.

8.6.     In my opinion the party identified as "LENDER" "originated" loans acting as a mortgage broker and not as a mortgage lender. The real lender was the source of funds advanced for the funding of the loan. I rely upon common definitions of creditor, debtor, lender etc. found in bankers' glossaries, law dictionaries, and through my practical experience and training in securities analysis, underwriting, my training in law school, my training in business school and my experience on Wall Street, and as a practicing lawyer in commercial transactions and commercial litigation.

8.7.     Answers are required either in response to the qualified written request or through discovery. Confirmation of my opinions would include but not be limited to the manner in which each firm in the securitization reflected the transaction on its own financial records. In most cases it appears merely as fee income or profit on sale which would confirm that the party never was a creditor.

8.8.     It appears as though all originated loans were subject to previously existing agreements including Pooling and Service Agreements and Assignment and Assumption Agreement, in which the originated loans were already pledged

8

or conveyed to third parties (investors/creditors/LENDERS) at the time of Plaintiff's "closing."

8.9.     At each level of securitization a successor "Trustee" was named purporting to acquire all powers of the "Trustee" before the loan was transmitted, transferred, sold or hypothecated to another party. In each case there does not appear to actually be a "Trust" as the beneficiaries of each "Trust" are either ambiguous or not present at all.

8.10.    In each case the nominal "Trust" actually contained no assets, the same having been transferred to yet another entity PRIOR to the existence of the subject transaction.

8.11.    In the case of the entity that issued bonds to the creditors as mortgage backed securities, in each case the mortgages to back those securities did not yet exist. In each case, though, the body of the bond indenture explicitly conveys a percentage interest in the "pool" to the creditor forming what appears to be a general partnership, with the indenture in reality being a partnership or operating agreement.

8.12.    In each case, the "Trustee" is named but then described and its powers circumscribed increasingly as one reads through the enabling document, such that it appears that the party named as "Trustee" is in actuality an agent with very limited powers.

8.13.    In many cases and in particular with the parties involved in this litigation, they were the recipients of proceeds from the Federal Reserve that "purchased"

9

the mortgage backed securities, thus making the Federal Reserve the creditor in whole or in part in these subject transactions.

8.14.  Typically all such indentures create a hybrid security that is both bond and equity, to wit: the bond provides for a stated interest rate of return and provides ownership of a percentage of a pool of assets comprised of residential loans, which would most certainly have included the subject loan.

8.15.  In many cases the "trusts" were disbanded and no longer exist as legal entities. Without further disclosure from these parties, it is impossible to know whether the vehicles used for processing the creditor's investment in mortgage loans still exists and if so, its status.

8.16.  In most cases there have been multiple assignments or transmittals of documents or rights with regard to multiple parts of the securitization chain. These various stakes or revenue streams could include but not be limited to servicing rights, foreclosure rights, collection on the note, collection of federal bailout grants or loans, collection of payments from co-obligors added during the securitization of the Debtor's note, and collection of payments on credit default swaps which frequently are leveraged as much as thirty times the original value of the note(s) in the pool of assets subject to the CDS. Thus it is not known by the servicer or originator whether the Plaintiff/Debtor's note is or ever was in default – a fact that can only be known by the creditor and which is either not known or being withheld by the securitization parties in the case at bar. Based upon published reports, in my opinion, there is a very high probability that all or

10

part of the Debtor's note was paid in whole or in part by third parties, that different parties came to claim rights to enforce the mortgage and note and that the intention to split the note from the mortgage while heretofore unusual in the marketplace was commonplace in securitization of residential loans. Hence, it is my opinion that the holder of the note, either singular or plural, are not the same parties as those who purportedly hold the mortgage and that this was a result that was intended by the mortgage originator and the parties to the securitization chain, since it was a typical practice in the investment banking industry in their process of securitizing loans throughout the period of 2001-2009.

8.17.    The above facts result in a conflict of interest, claims and stakes by numerous parties contained within the securitization chain, some of which parties are known and some of which are not known to Plaintiff/Debtor and therefore not known to the undersigned declarant.

8.17.1.    It also appears that the standard industry practice of creating a yield spread premium between the lender and originator was extended and expanded in the case of the securitization chain such that in this case, in my opinion, the Plaintiff/Debtor's loan was sold to the investors at a gross profit (i.e. a second yield spread premium) to the participants in the securitization chain of at least 35% of the total principal balance of the note. In my opinion, this disclosure does not appear on any of the closing documents identifying the parties participating in fee-splitting or yield spread premiums nor the amounts involved as required by the Truth in Lending Act and the Real

١١

Estate Settlement Procedures Act. Further, no information appears in Plaintiff/Debtor's closing documentation that would have caused him to inquire about such a premium, which exceeds any yield spread premium ever paid prior to the securitization of residential mortgages. In my opinion, it is equally probable that the investors were kept unaware that less than 2/3 of their investment was actually going to fund Plaintiff/Debtor's loan and other similarly situated. Based upon direct conversation with Plaintiff/Debtor, he also was unaware that such large profits or premiums were being generated by virtue of his identity and signature on the purported loan documents.

8.18.    Additional information submitted by licensed appraisers still in good standing with the licensing board along with public records documentation in other states indicates a pattern of behavior consistent with the subject "loan" Transaction, corroborates the existence of the second yield spread premium and shows that the appraisal on the property, upon which the property owner reasonably and legally relies as per the requirements of law and regulation, was artificially inflated per direct instructions from the purported "lender" or other firms in the securitization chain ultimately receiving their instructions from the investment banking firm that did the underwriting of the securities sold to the creditors/investors and which issued the instructions regarding the underwriting of the purported loans to homeowners including the subject transaction.

9.    My opinions are also based upon substantial knowledge, training, experience,

12

study and analysis of securities, securities regulation, securitization, derivatives and various precursor asset protection or bankruptcy remote schemes in commercial and real estate settings.

10. My opinions are also based upon direct interaction via telephone, email or written correspondence with many intermediary conduits and some underwriters of the reissued securities to investors who bought mortgage-backed securities.

10. My opinions are based upon certain assumptions regarding securitization of the subject loan which can only be verified by review and analysis of the actual securitization documents, applicable credit default swaps or other insurance or hedge products, and audit, review and analysis of the effect, if any, of federal bailout money received by the creditor, (i.e., the party who actually advanced the funds from which the subject obligation was funded) or any parties who received such funding or money relating to or arising from the subject homeowner obligation created by the financial loan product sold to the homeowner in this instance.

11. I express the following opinions that are offered within a reasonable degree of factual certainty and financial probability based upon filings with the Securities and Exchange Commission, prior knowledge of intermediary/conduit parties in the subject transactions, and the known participants in this loan and its securitization:

11.1. The subject real estate and securities transactions were securitized, to wit: The subject homeowner and the unidentified Lender(s)/investor(s) entered into a transaction which was represented as a loan transaction whereby the investor(s) lent money to the homeowner and other homeowners similarly situated.

13

11.2.    In terms of the real estate portion of the transaction, the homeowner was the borrower and the investor was the lender. The investor is still the lender if the investor has not sold, transferred or alienated the hybrid mortgage backed security and if the investor has not been directly or indirectly paid through credit default swaps, with or without subrogation, or paid through a federal program with or without subrogation. Since no such instruments appear on record, any right of subrogation would appear to be equitable. Thus for purposes of this declaration, the unknown and undisclosed investor(s) constitute the only Lender presumed to exist until the undersigned is presented with contrary evidence admissible in a court of law.

11.3.    The only parties that can claim to be creditors (or a holder in due course of the note) are those who would suffer a monetary or pecuniary loss resulting from non-payment of the obligation either because they advanced the actual funds from which the Bailey Loan Product was funded or because they would have paid value prior to default or notice of default. These parties fall within one or more of the following classifications:

11.3.1.        Investors who purchased asset backed securities in which ownership of the LOANS was described with sufficient specificity as to at least express the intent to convey ownership of the obligation as evidenced by the promissory note and an interest in real property consisting of a security interest held by an entity that was described as the beneficiary of a Trust created by an instrument entitled Deed of Trust;

14

THEREFORE I CONCLUDE THAT THE CREDITORS ARE THE UNIDENTIFIED INVESTORS AND ALL OTHER PARTIES ARE INTERMEDIARY OR REPRESENTATIVE OR DISINTERESTED.

11.4.    Title is affected by the following:

11.4.1.    Insurers that paid some party on behalf of said investors;

11.4.2.    counter-parties on credit default swaps;

11.4.3.    conveyances or constructive trusts arising by operation of law through cross collateralization and over-collateralization within the aggregate asset pools or later within the Special Purpose Vehicle tranches ("tranches" is an industry term of art referring to the types of division within a Special Purpose Vehicle);

11.4.4.    the United States Treasury Department through the Troubled Assets Relief Program in which approximately $700 billion has been authorized and paid to purchase or pay the obligation on "troubled" (non-performing) assets of the LOANS. The subject "loan" is part of the class of assets targeted by TARP;

11.4.5.    the United States Federal Reserve, which has extended credit on said troubled assets and has exercised options to purchase said troubled assets;

11.4.6.    any other party that has traded in mortgage backed securities from the aggregated pools or securitized tranches containing interests in the LOANS.

15

12.    However, it is unlikely that any holder in due course exists because in the practice of securitization as it was followed universally within the investment banking community, the recorded encumbrance was never effectively or constructively transferred because it was never executed in recordable form nor was an effort made to create such a document by the parties to the instant case until they decided to issue a notice of delinquency, notice of default, notice of sale, and Petition for Unlawful Retainer and Writ of Possession.

12.1.    Hence any transfer or purported transfer of the note was not accompanied by the encumbrance being incident to said transfer because applicable recording statutes require an interest or change of interest in real property to be recorded. Hence the loan product sold to the subject homeowner included a promissory note that was evidence of a real obligation that arose when the transaction was funded but lost its negotiability, thus barring anyone from claiming holder in due course status.

12.1.1.    The negotiability of the note is negatively affected by (1) the splitting of the note and mortgage as described above, (2) by the addition of terms, conditions, third party obligors and undisclosed profits, fees, kickbacks all contrary to existing federal and state applicable statutes and common law and (3) knowledge of title and chain of title defects in the ownership of the note, beneficial interest in the encumbrance, and position as obligee on the obligation originally undertaken by the subject homeowner. .

16

12.2. None of the known participants in the subject securitization chain (including but not limited to Defendants herein) falls within any of the classifications of "Lenders" or holders in due course on the subject financial products sold to the subject homeowner as LOANS. A Lender or Creditor is a party who advances or creates money for the benefit of another with the expectation of receiving it back, usually with a profit denominated as "interest." The investor fits this definition. All other parties including the putative foreclosing parties in the case at bar, fall into the class of intermediaries or conduits, playing the role of payment mechanism or document repository or record keeper.

12.3. None of the known securitization participants has suffered any financial loss relating to the LOANS, nor are they threatened with any future loss if foreclosure remains enjoined by the automatic stay.

12.4. None of the known securitization participants has ever been the real party in interest as a lender or financial institution underwriting a loan while funding same with respect to the LOANS.

12.5. None of the known securitization participants will suffer any monetary loss through non-performance of the LOAN.

12.6. All of the known securitization participants received fees and profits relating to the LOANS.

12.7. The existence and identity of the real parties in interest was withheld from the homeowner in the closing and servicing of the LOANS, and since.

13. Several transactions have purportedly taken place regarding the Bailey "Loan."

17

None of them appear to have actually conveyed anything since all conveyance documentation was effective simultaneously or contemporaneously with closing of the subject transactions. The investors are still the source of funding, the securities were sold to the investors with conveyance of ownership of the "Loan" product purchased by Bailey, and the transfers claimed by "successor" parties all occurred AFTER the conveyance was effective in favor of the investors. Since the loans were conveyed before the transfers for good consideration, I conclude that none of the other parties posses any title, color of title, or claim under the note and mortgage executed by Bailey.

14. Further, the award of title to any of these other parties would be in derogation of the title and claims of the investors who are the only and actual sources of funding/consideration. The interest in the obligation, the note as evidence of the obligation, and the security interest for the obligation were purportedly transferred multiple times without recording the change in ownership of an interest in real property in the appropriate county records. In my opinion, the "Lender" in securitized loans is only a nominee for an undisclosed principal. The transaction with the homeowner is subject to a pre-existing contractual relationship wherein the investors advanced the cash for the loan and profits, fees, expenses, rebates, and kickbacks. This is known to many of the known and unknown securitization participants, inasmuch as they have been the recipients of memoranda from legal counsel and advisers (not protected by attorney client privilege or the attorney work product privilege) in which they have been informed that any nominee that does not advance

13

cash for funding the loan and does not receive any payments on the obligation in particular allows multiple parties to make claims on the same property from the same borrower, using the same note and the same security interest.

14.1.    The intended monetary effect of the use of such a nominee was to provide obfuscation of profits and fees that were disclosed neither to the investor who put up the money nor to the borrower in this LOAN. In the case at bar, it is my opinion based upon a reasonable degree of certainty (beyond more likely than not) that the total fees and profits generated were actually in excess of the principal stated on the note --- which is to say that investors unknowingly placed money at risk the amount of which vastly exceeded the funding on the loan to the borrower.

14.1.1.    The only way this could be accomplished was by preventing both the borrower and the investor from accessing the true information, which is why the industry practice of nominees like the private MERS system were created.  Even where MERS is not specifically named in the originating documents presented to the homeowner at the "closing" it was industry practice from 2001-2008 to utilize MERS "services". Therefore it is possible and even probable that the data from the closing was entered into the MERS electronic registry and that an assignment was executed to MERS purportedly giving MERS some power over the obligation, the note and/or the encumbrance. As a general rule in securitized transactions and especially where MERS is named as nominee, documents of transfer

19

(assignments, endorsements, etc.) are created and executed contemporaneously with the notice of default thus selecting a participant in the securitization chain to be the party who initiates collection and foreclosure.

15.    The notice of default in the case at bar was in all probability substantially before any fabrication or creation of documents of transfer and before any such documents were recorded. Further it does not appear that any such documents were executed in recordable form under the laws of the State and in accordance with the local administrative rules governing recordation of instruments that purport to show an interest in real estate. Hence it is my opinion, as above, that the existence of any document of transfer in this case is inconsistent with the authority – apparent or actual --- to execute same without some additional documentation establishing a foundation for the document of transfer (assignment, endorsement etc.). No such document having been produced the inescapable conclusion is that no authority exists and that if permitted to move forward with a foreclosure or foreclosure sale, a title defect would be created beyond the current cloud on title, thus rendering the title permanently unmarketable without the entry of a court order from a court of competent jurisdiction declaring the rights of all stakeholders --- potential and otherwise. This opinion should not be construed to deny the existence or validity of the note, mortgage or underlying obligation. It is meant solely to convey the opinion that none of the existing parties known to the homeowner have any authority, apparent or otherwise, to declare the obligation in default or to pursue collection on

20

the only potential party to a foreclosure wherein the purported creditor alleges financial injury and therefore a right to collect the obligation, enforce the note or enforce the security instrument is either a party who has actually advanced cash and stands to lose money or an authorized representative who can disclose the principal, provide proof of service or notice, and thus show such authority.

17.     In my opinion, as above, and with a reasonable degree of factual and legal certainty, the disclosed principals in the securitization chain are not the Lender(s) nor are they agents for the Lender(s). In my opinion, as stated in this paragraph, these parties are interlopers or impostors whose design is to take title to property they have no right to claim, and to enforce a note which is evidence of an obligation that is not owed to them but rather to another. The details of this information, whether the special purpose vehicle still exists, whether the investor(s) has been paid in full through federal or insurance payment, are known only to these securitization participants.

18.     In my opinion the attorneys for the known securitization participants do not have any authority to represent the Creditors, and could not represent them due to the obvious conflict of interest, to wit: the investor(s) upon learning that a substantial amount of their advance of cash was pocketed by the intermediaries and now is left with a mortgage whose nominal value is far below what was paid, and whose fair market value is far below the nominal value, would have potential substantial claims against the securitization participants for fraud, breach of contract, and other claims.

19.     I have also reviewed, for the past 40 years, published Financial Accounting

22

Standards obviously intended for auditors involved in auditing and rendering opinions on the financial statements of entities involved in securitization, securities issuance and securities sale and trading. If the known participants in the securitization scheme followed the rules, they did not post the instant transaction as a loan receivable. The transaction most likely was posted on their ledgers as fee income or profit, which was later reported on their income statement in combination with all other such transactions. These rules explain how and why the transactions were posted on or off the books of the larger originating entity. These entries adopted by said companies constitute admissions that the transaction was not considered a loan receivable on its balance sheet (or on the ledgers used to prepare the balance sheet) but rather shown on the income statement as a fee for service as a conduit. These admissions in my opinion are fatal to any assertion by any such party currently seeking to enforce mortgages in their own name on their own behalf, including but not limited to the securitization participant in this case.

20.     In my opinion, with a high degree of certainty, the Plaintiff/Debtor's title was and is subject to a cloud on title, a claim of unmarketable title and possibly a title defect that cannot be cured without court order as a result of the manner in which Plaintiff/Debtor's loan was securitized. In all cases reviewed by me, which include more than fifty securitization chains, the Prospectus and other published documents clearly express that a securitized mortgage is treated sometimes as being secured by real estate, and sometimes as not being secured by real estate, depending on the context and purpose of the accounting. The naming of a party other than the Lender

23

as beneficiary under the Mortgage Deed as distinct from a third party named as Payee on the promissory note and the same or other third party named as beneficiary under the policy of title insurance demonstrates an intent or presumption or reasonable conclusion that there was intent by some or all of the parties at various times in the steps of the securitization process to separate the Note from the Deed of Trust, thus creating a cloud on title for both the owner of the property and any party seeking to express or claim an interest in the real property by virtue of the encumbrance.

FURTHER, AFFIANT SAYETH NAUGHT.

Signed on January 17, 2010

/s/ Neil Franklin Garfield, Esq.

_____

24

**ANDREW C. BAILEY**
2500 N. Page Springs Rd
Cornville, AZ 86325
928 634-4335
*Debtor in Pro Per*

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| In re: | **Chapter 11** |
|---|---|
| ANDREW C. BAILEY | **Case #: 2:09-bk-06979-PHX-RTBP** |
| Debtor/Plaintiff | (Associated Case # 2:09-ap-01727-RTBP) |
| | **DEBTOR'S FIRST SET OF** |
| Vs | **INTERROGATORIES AND FIRST** |
| | **REQUEST FOR PRODUCTION OF** |
| WELLS FARGO BANK, NA | **DOCUMENTS** |
| Movant/Defendant | (Related to Docket #22) |
| | Subject Property: |
| | 153 Western Avenue |
| | Glendale, CA 91201 |

## DEBTOR'S FIRST SET OF INTERROGATORIES

## AND FIRST REQUEST FOR

## PRODUCTION OF DOCUMENTS

Pursuant to Rule 33 and Rule 34 of the Federal Rules of Civil Procedure, Debtor/Plaintiff
requests that Movant/Defendant answers the following Interrogatories and produces
documents in accordance with the following Request for Production of Documents.

Exhibit D

-1-

01/20/2010

## DEFINITIONS

1. WELLS FARGO BANK NA includes any and all persons and entities presently or formerly acting for or in concert with WELLS FARGO BANK NA.

2. LEHMAN BROTHERS BANK FSB includes any and all persons and entities presently or formerly acting for or in concert with LEHMAN BROTHERS BANK FSB, LEHMAN BROTHERS INC, its heirs and assigns.

3. US BANK NA includes any and all persons and entities presently or formerly acting for or in concert with US BANK NA.

3. "Document" includes each record held in WELLS FARGO BANK NA's possession or generated by WELLS FARGO BANK NA.

4. The word "document(s)" includes all "writings," "recordings," and "photographs," as those terms are defined in Rule 1001 of the Federal Rules of Evidence, and should be construed in the broadest sense permissible. Accordingly, "document(s)" includes, but is not limited to, all written, printed, recorded or graphic matter, photographic matter, sound reproductions, or other retrievable data (whether recorded, taped, or coded electrostatically, electromagnetically, optically or otherwise on hard drive, diskette, compact disk, primary or backup tape, audio tape or video tape) from whatever source derived and however and by whomever prepared, produced, reproduced, disseminated or made. Without limiting the generality of the foregoing, "document(s)" includes the original and any non-identical copy and also every draft and proposed draft of all correspondence, internal memoranda, notes of meetings, telegrams, telexes, facsimiles, electronic mail, reports, transcripts or notes of telephone conversations, diaries, notebooks, minutes, notes, tests, reports, analyses, studies, testimony, speeches, worksheets, maps, charts, diagrams, computer printouts, and any other writings or documentary materials of any nature whatsoever, whether or not divulged to other parties, together with any attachments thereto and enclosures therewith. In addition,

the word "Document(s)" encompasses all forms and manifestations of electronically or optically coded, stored, and/or retrievable information, including but not limited to "e-mail," "voice mail," digital images and graphics, digital or analog audiotapes and files, and digital or analog videotapes and files.

5. The word "person(s)" includes not only natural persons, but also firms, partnerships, associations, corporations, subsidiaries, divisions, departments, joint ventures, proprietorships, syndicates, trusts, groups, and organizations; federal, state, or local governments or government agencies, offices, bureaus, departments, or entities; other legal, business, or government entities; and all subsidiaries, affiliates, divisions, departments, branches, and other units thereof or any combination thereof.

6. As used herein, any reference to any "person" includes the present and former officers, executives, partners, directors, trustees, employees, attorneys, agents, representatives, and all other persons acting or purporting to act on behalf of the person and also its subsidiaries, affiliates, divisions, and predecessors and successors in interest.

7. The words "you," "your", "defendants" or "movants" refer to defendants, defendant-intervenors, movants, and their agents, representatives, attorneys, experts, and all other persons acting or purporting to act on behalf of Movants.

8. The singular of each word shall be construed to include its plural and vice versa, and the root word and all derivations (*i.e.*, "ing," "ed," etc.) shall be construed to include each other.

9. The words "and" as well as "or" shall be construed both conjunctively as well as disjunctively.

10. The word "each" shall be construed to include "every" and vice versa.

11. The word "any" shall be construed to include "all" and vice versa.

12. The present tense shall be construed to include the past tense and vice versa.

13. The masculine shall be construed to include the feminine and vice versa.

01/20/2010

14. The words "knowledge," "information," "possession," "custody," and "control" of a person shall be construed to include such person's agents, representatives, and attorneys.

15. The word "including" shall have its ordinary meaning and shall mean "including but not limited to" and shall not indicate limitation to the examples or items mentioned.

16. The phrase "reflect, refer, or relate to" means reflecting, referring to, relating to, regarding, discussing, concerning, constituting, mentioning, pertaining to, alluding to, or associated with.

17. The words "to present" mean to the date on which you respond to these interrogatories and requests.

**INSTRUCTIONS**

1. Unless otherwise specified, if your response in regard to a portion of the time period addressed in any interrogatory differs from your response in regard to another portion of such period, provide a response for each such portion and indicate the period of time to which each response relates.

2. Deem any reference to a non-natural person to include the legal predecessors of such non-natural person.

3. When an interrogatory asks you to "describe" or "identify" a document, provide the following information with respect to each such document:

a. The date appearing on such document; or if it has no date, so state and give the date or approximate date such document was prepared, produced, created, or came into being;

b. Any identifying or descriptive code number, file number, title or label of such document;

c. The general nature or description of such document;

d. The name of the person(s) who signed, authored, produced or created such document;

e. The name of the person(s) who prepared such document if different from the name provided pursuant to subpart (d) of this instruction;

-4-

f. The name of the person(s) to whom such document was addressed and the name of each such person other than the addressee to whom such document, or copy or reproduction thereof, was given or sent;

g. The name of the person or entity having present possession, custody and/or control of such document;

h. The present location of such document;

i. If such document was, but is no longer in your possession or control, state what disposition was made of such document, the reason for such disposition, and the date thereof.

j. Whether or not any draft, copy, or reproduction of such document contains any script, notation, change, addendum, or the like, not appearing on such document itself, and if so, the answer shall give the description and identification of each such draft, copy or reproduction in accordance with the above subparts (a) through (i).

4. The above information shall be given in sufficient detail to enable any person or party to whom a subpoena or request for production is directed to identify the documents sought to be produced and to enable counsel to determine whether such document, when produced, is in fact the document so described and identified.

5. Notwithstanding any other instruction in this First Set of Interrogatories that is or may be to the contrary, if a document has already been produced by you to the Plaintiff, such document may be identified by specifying the Bates numbers for all pages of such document.

6. A request that you identify a document is not limited to documents within your possession, and such requests shall extend to all documents under your control.

7. When an interrogatory asks you to "identify" a person, the answer shall contain the following information with respect to each such person:

a. The full name, current or last known business and residence addresses, and business and residence phone numbers of such person;

b. The name and address of the agency, employer or entity at which such person worked and/or to which such person reported;

c. The title(s) and related periods of service for such person with each such agency, employer or entity.

8. When an interrogatory calls for the "description" or "identity" of any "document" you contend to be subject to a privilege against disclosure in response to these interrogatories, provide with respect to each such document or communication the following:

a. The nature of the document you contend is privileged (*e.g.*, letter, memorandum, chart, picture, report, etc.);

b. The number of pages comprising the document and a description of any identifying marks or designations (*e.g.* Bates numbers) if any, on the document;

c. The date of the document which you contend is privileged;

d. The name(s) of the author(s) and of any recipient(s) of the document;

e. The name and address of any person who is not included in your response to subpart (d) with respect to such document and who has access to or has seen, read, or heard any portion of the material in the document that you contend to be privileged; and

f. The nature of the privilege asserted.

9. In answering each of these interrogatories, furnish all information available to you that is relevant or that might lead to the discovery of relevant evidence, including information in the possession of your attorneys, or their investigators, and all persons acting on your behalf, including but not limited to your employees, agents, officers, or representatives. If you are unable to answer these interrogatories in full after exercising due diligence to supply a complete answer, so state and answer to the extent possible. Specify the reasons

01/20/2010

for your inability to answer and state whatever information or knowledge you have concerning the unanswered portions.

10. For each interrogatory or part of an interrogatory that you refuse to answer on grounds of burdensomeness, explain in as much detail as possible the basis for your refusal.

11. These interrogatories are deemed to be continuing; as such, you are requested to file and serve by way of supplemental answers thereto such additional information as may be required to complete your answers to these interrogatories.

**INTERROGATORIES**

Where applicable, with respect to your answer to each of these interrogatories, please:

A. identify each person on whose testimony you will or may rely in support of your answer;

B. identify each document on which you will or may rely in support of your answer.

1. State the name, job title and business address of each person providing information in response to these discovery requests:

2. State the type of business organization WELLS FARGO BANK NA is, and name each State of the Union in which WELLS FARGO BANK NA is chartered or registered:

01/20/2010

3. State the name, job title, and business address of each person who has first-hand personal knowledge of the time and circumstances under which the promissory note obligating Andrew C. Bailey and/or alienable in this instant case was created, sold, transferred and/or assigned for value:

4. State the name and contact information of the creditor in the instant case.
   (NOTE: The creditor is the person who actually provided the money for the Debtor's table-funded loan in expectation of payment, and who stands to lose money in the event of default.)

5. State the names and contact information of all persons or entities, in order of assignment, who at any time were constructive holders or holders in due course of the promissory note obligating Andrew C. Bailey and/or alienable in this instant case:

6. State the name and contact information of the current beneficiary under the promissory note obligating Andrew C. Bailey and/or alienable in this instant case:

7. If the name of the current beneficiary under the promissory note obligating Andrew C. Bailey and/or alienable in this instant case in Item (6) above is different from your name (WELLS FARGO BANK NA), explain why the Order signed by Honorable Judge Redfield T. Baum on October 2, 2009 states, inter alia, words to the effect that "the current beneficiary under the promissory note is WELLS FARGO BANK NA":

8. Explain why the alleged copy of the promissory note submitted as Exhibit "A" attached to Movant's Motion for Lift from Stay includes no allonge or endorsement showing any assignment of the note to WELLS FARGO BANK NA:

9. If WELLS FARGO BANK NA did not keep or cannot produce a copy of an allonge or other paper showing assignment to WELLS FARGO BANK NA of the promissory note obligating Andrew C. Bailey and/or alienable in this instant case, explain why.

01/20/2010

10.     Identify the name, address and telephone number of each person or entity likely to have discoverable information relevant to the foregoing or that you may use to support your action.

## REQUEST FOR PRODUCTION OF DOCUMENTS

Debtor/Plaintiff hereby requests that Movant/Defendant WELLS FARGO BANK NA produce the following documents for inspection and copying within 30 days of service of this request, or any earlier date on which the parties agree, subject to the foregoing Definitions and Instructions set forth above, at the offices of the Yavapai County Recorder, 6th Street, Cottonwood, AZ or at another location agreeable to the parties hereto.

1. Produce the <u>original</u> promissory note signed by Andrew C. Bailey and/or alienable in this instant case. If none, state "none."

2. Produce all documents identified by you in response to each interrogatory set forth above. If none, state "none".

3. Produce all documents associated with WELLS FARGO BANK NA's transfer and assignment of all beneficial interest in the promissory note alienable in this instant case to US BANK NA. If none, state "none".

4. Produce a copy of the allonge or endorsement attached to the promissory note obligating Andrew C. Bailey and/or alienable in this instant case showing an assignment of the promissory note from US BANK NA or another person back to WELLS FARGO BANK NA. If none, state "none."

5. Produce any and all Pooling and Servicing Agreement or other contractual agreement or memo involved in the "securitization" of the subject promissory note. If none, state "none".

6. Produce the account and general ledger statement of each transaction WELLS FARGO BANK NA alleges Andrew C. Bailey has made with WELLS FARGO BANK NA with respect to the promissory note alienable in this instant case, showing all receipts and disbursements. If none, state "none".

7. Produce all bills of sale and allonges and agreements illustrating where the promissory note alienable in this instant case was sold or assigned for value, from inception to the present. If none, state "none".

8. Produce all insurance claim information and credit default claim or settlement or payment records relative to any alleged default under the promissory note alienable in this instant case. If none, state "none".

9. Produce all information pertaining to Federal TARP or other bailout settlements or payments relative to any alleged default under the promissory note alienable in this instant case. If none, state "none".

10. Produce all contracts, agreements, and/or memos illustrating that law firm Tiffany & Bosco, PA has authority to represent WELLS FARGO BANK NA in this instant case. If none, state "none".

11. Produce all contracts, agreements, and/or memos illustrating that WELLS FARGO BANK NA or its attorney law firm Tiffany & Bosco, PA has authority to represent the creditor or US BANK NA or LEHMAN BROTHERS BANK FSB in this instant case. If none, state "none".

12. Produce all documents or data compilations that are in your possession, custody or control that you may use in support of your action.

Respectfully submitted this 11th day of January, 2010

Signed_____
       Andrew C. Bailey, *Debtor in Pro Per*

**CERTIFICATE OF SERVICE**

I, Andrew C. Bailey, certify that on the 11th day of January, 2010, a true and correct copy of Debtor/Plaintiff's First Set of Interrogatories and First Request for Production of Documents was served upon the attorney for Movant/Defendant by both certified mail and facsimile transmission to:

Leonard McDonald, Esq,

Tiffany & Bosco, PA

2525 East Camelback Road, Suite 300

Phoenix, AZ 85016

(Attorney for Wells Fargo Bank NA)

Signed this 11th day of January, 2010.

Andrew C. Bailey, *Debtor in Pro Per*

- 14 -